take a short break, and come back with a slightly different panel. So, Mercier v. United States, Mr. Cook. Good morning, Your Honors. Good morning. May it please the Court, my name is David Cook. I'm counsel for the appellant, plaintiffs in this matter, Stephanie Mercier, and a putative class of Title 38 advanced practice nurses employed by the Veterans Affairs Administration. We come today appealing the decision of the Federal Court of Claims, which granted the VA's motion to dismiss. Granted the motion to dismiss, finding that the language of 38 U.S.C. Section 7453E, which grants overtime pay to Title 38 nurses, and requires that overtime be officially ordered or approved, could only occur by express direction. We believe that that is contrary to the decision of this Court in Doe 2, this Court's decision in the Doe cases, and also contradicts the in two ways. First, by dismissing the claims for compensation for overtime, and secondly by dismissing the claims which assert that if overtime pay is not available, some form of pay must be available at standard or basic rates. Otherwise, the government is coercing free work. Well, that's your argument, right? It's a coercion. It's a conscious coercion to require the nurses to do extra work. We believe that's correct. I have just a basic question, and maybe this is for a later stage in the proceedings if you were successful, but how do you prove that on a common basis? How do we prove the work? No, how do you prove the effect that the coercion was successful on a common basis? How is it not just an idiosyncratic response on the part of each nurse? Because there are computer records. We're talking about computerized patient record systems, and every time one of the Title 38 nurses is in the system, it's logged, whether they're on their tour of duty or outside. And that brings up the point, Your Honor, that laptops, tools to perform these view alerts are assigned by the VA to the Title 38 nurses. Those laptops are not assigned to perform the work in the facility during their tour of duty. Those laptops are assigned to take home and perform the work from a remote location. In addition to laptops, Title 38 nurses are given remote access codes to access a virtual private network so that they can log in to the CPRS system and review and deal with view alerts. Those two facts, which must be accepted as true under the motion to dismiss standard, are significant proof that the work here is compelled. Mr. Cook. Yes, sir. You don't have to get around Doe too, really. You have to get around Hanson. We don't believe Hanson applies. Hanson applied the standard that a regulation could impose a procedural requirement that would supplement or be an adjunct to the statute. Hanson versus Swipert. In the Doe case, Doe 2, the OPM... They read it very broadly in overruling Anderson. Yes, they do. But first of all, Doe arose under Title 5, not Title 38. And the OPM issued a specific regulation which dictated that overtime could only be authorized in writing. The VA has conceded there is no such regulation here. Now, under Title... If they had such a regulation, you wouldn't be in front of us. That's correct. That's exactly correct. Nothing prevents... Let me ask one question. You mentioned when you first started that you've got two claims. One is based on inducement under 7453 and the other was a claim in case that loses your entire common law right to pay. If we were to rule in your favor on the first issue, that moots the second issue, doesn't it? Correct. That's correct, Your Honor. I want to go back to the point of the regulation and what the VA actually does. The VA has conceded both in its motion to dismiss briefing at page 10, footnote 9, and in its briefing to this court, that because of the nature of the duties, the patient care responsibility of Title 38 nurses, that a written requirement is too formal, that there are urgent and emergency circumstances where overtime cannot be authorized in writing, and in particular, in advance. Now, the court of claims put together two pieces of the Doe case and came up with the standard of express direction. Title 38, section 7453 standard, uses the same phrase as Title 5, officially ordered or approved, in the disjunctive, or approved. We assert that express direction reads approved out of the statute. And we believe that the VA's position is inconsistent. If a writing requirement is too formal because of the nature of the duties, the patient care responsibility, then express direction eliminates the ability to approve of work that wasn't authorized in advance. But here's what I'm struggling with. It's very practical. And maybe this is a factual issue that we don't get to on a pleading motion, but do we know how many nurses actually need to do the view alerts after hours? Do we have data on that? Well, all we know is one study that was conducted by the VA at the Houston facility, and 85% of the nurses were spending an additional approximately 50 to 56 minutes each day attending the view alerts beyond their tour of duty. We don't have statistics for the entire VA system. So we don't know how widespread this phenomenon is. We don't know what decisions were made by the individual nurses about what they were going to do when. We don't know how we got to this point. Well, we know we got to this point, Your Honor, Judge Fogle, by the fact that the computer record system was implemented and that at pages 64 and 65 of the appendix, the court will find the overtime, or excuse me, the provisions for requirements to attend to the view alerts. Right. And some of it depends. Obviously, this is appropriate for factual determination on remand. But it's very clear that some of these Title 38 nurses, particularly the nurse practitioners and the clinical specialists, have what are known as patient panels. That's the group or listing of patients, veterans, that they are personally responsible for. Understanding that Title 38 nurses are the first line of primary care in the VA system for the veterans who are seeking medical assistance. We're at the pleading stage in this case. Yes. And Judge Kaplan indicated that she believed that your allegations have proven true would likely suffice to grant you an inducement cause of action. She did. And so let's talk a little bit about Doe. That seems to be the elephant in the room to the extent if Hanson is not. Let's talk a little bit about the authority of the Doe panel. The line of cases coming out of Anderson are binding on this court, right? Correct. And this court lacks the authority to upset any of those holdings unless there's an intervening Supreme Court authority that requires it, right? Yes. And the Doe court found that Hanson required that with respect to Title V. Let me finish. Let me just hear my take on the case. So as of the time that the Doe panel comes along, this court has consistently interpreted the FEPA language in FEPA, which is the same as in 7453. The same phrase. To allow inducement to be a form of official ordering or approval, correct? Yes. That's correct. So you say to yourself, well, to the extent that the Doe panel says to the contrary, where does it get the authority to do so? So that backs us up to Hanson. We go back and look at Hanson and we say, well, what did Hanson have to say about whether inducement is sufficient for the statutory words officially ordered or approved? And you look all through Hanson and you don't see any of that. You don't see anything in him. They weren't even talking. Hanson case didn't involve the FEPA. It did not. So if we conclude that Hanson didn't touch that piece of Anderson that had construed the FEPA law language to include inducement, then I would think that the Doe panel didn't have the authority to change that. I'll agree with you precisely that they didn't have the authority to change it. And to the extent they had any authority, it didn't extend to Title 38 where there's no written requirement or regulation. Let's just stop. Don't get greedy. Okay. Pigs get fat and hogs get slaughtered. Because it's the very government that tells us that we must construe the 7453 language exactly the same as we construe the FEPA language. Correct. And that seems to be a reasonable argument. And you know what that caused me to do last night when I was looking this case over again? I said to myself, when was 7453 enacted? It was enacted in 1991, right? And in 1991, the court had consistently construed FEPA to allow inducement to be a form of officially ordered or approved. Correct. And under the doctrine of legislative ratification, right? Yes. We are presumed that when Congress uses the same word in another statute, they are intended to mean the same thing as construed by the courts. And the argument is present, Your Honor, that Congress ratified the Anderson line of cases applying that. That's my point. Yes. And you say to yourself, well, if Doe is the elephant in the room, where did the Doe Pound get the authority as a matter of power to change the established law that has been ratified by Congress? And the answer is they don't have the power. We concur. It seems to me that your case is really quite simple. We believe it's very simple. We believe that your analysis is correct. It's the government on the ratification point, because it's the government who tells us that we must construe 7453, magic word, exactly the same as it's construed in FEPA. And then the government latches on to Doe. The government can't latch on to Anderson because it destroys its position, right? They cannot. It's correct. And so the burden is on the government, from my perspective, to convince me that Hansen erased that part of Doe – pardon me, that part of Anderson that was construing the words in FEPA. Your Honor – Not only just Anderson, it is a very consistent line of cases all the way from Anderson right down to Doe 1. Correct. A consistent line of cases without variation. I hate to eat up your rebuttal time, but Judge Clevenger has given you things with which you can agree, and I want to give you an opportunity to deal with things with which you might disagree, and that is I suspect the government is going to say, oh, wait a minute. Look at Hansen. Look at Anderson. Look at Hansen. Look at Doe. But the equity principle can't apply in the face of the language of the statute and the legislative ratification that Judge Clevenger has just referenced. Well, you're not asking for relief by way of equity? We are not. It's not originally my claim. You're not asking for equity in the face of a statute that's in your favor. No. Originally, the complaint contained two equitable counts which were dismissed and not appealed. To reserve the remaining of my time for rebuttal, Your Honor, I first want to mention that at the end of Doe 2, this court said our predecessor court was legitimately concerned that at least in some instances such evasion as the government had used had occurred and that the government, in effect, was coercing uncompensated overtime. That is the case here, and we believe that the appropriate action of this court is reversed. It remains to be proven. It remains to be proven. You got my rule 11 with your allegation. Correct. But as Judge Fogel has brought out, a handful of really very interesting hurdles that you're obviously going to face if you get to go back. And that's the nature of litigation, and we're prepared to meet them. As I say, at this stage, if I were you, I wouldn't be too greedy. Well, as my colleague in the back said, pigs get fat, hogs get slaughtered. We'll stick with not being greedy. Thank you, Your Honors. May it please the Court. We respectfully request that this court affirm the trial court's decision because it properly held that an express directive is required for overtime to be officially ordered and approved under the plain language of the statute. In this case, plaintiffs admit that they received no such express directive. Therefore, the trial court properly found that plaintiffs failed to state a claim upon which relief can be granted. In this case, the plain language of 7432E requires an official order of approval. An official order of approval requires formality. Terms of order and approval require some form of communication, either oral or written, expressly directing or confirming work to be done outside the course of an employee's regular business hours. So, Counselors, just come down to the words that are used. If you look at their allegations as liberally as it requires you to look at them, they're saying the government knows that we can't get the view alerts done in addition to our nursing duties. We need to work these additional hours. They're telling us we have to do the view alerts. They know the work that we're doing. So the fact that they don't say, oh, by the way, you have to do it during your own time, the fact that they don't use those express words doesn't change the fact that they are consciously compelling people to work extra time. That's essentially what they're alleging. So do they have to – are you saying that there's no claim because they didn't use the exact words? You need to work outside of your normal work hours? Not those specific words in general, but you do need some form of communication expressly directing or confirming after the fact the requirement to work outside the course of your business hours. Right. But their allegation is they know that the nurses can't get the view alerts done during their normal working hours. And nonetheless, they say you have to get them done within X period of time. And you put those two facts together, that's express oral direction. Your Honor, you have to get them done within some form of time is not the same as you have to direct work outside the course of your business hours. Well, I know it's not the same, but if it has the same effect, is the government to say, well, we know that – again, I'm just looking at what they're alleging. As Judge Clevenger points out, I think that they're going to have some problems proving it, particularly on a class-wide basis, but that's not where we're at here. They're saying we can't do it during our normal work hours. You know that we can't do it during our normal work hours. You're telling us we have to do it within this period of time knowing that the effect is we're going to have to work outside of our normal work hours. That's what they're alleging. And why isn't that enough? The statute specifically requires an express directive in this case. Judge Fogle is asking you why what he had just said doesn't constitute an express direction. Because it does not especially direct. Why not? When somebody knows that the work has to be done, knows that it's going to have to be done after regular work hours, and the person who is being told to do the work knows that there are some adverse consequences to them if they didn't do it. Why doesn't that constitute an express direction? I think that was Judge Fogle's question. Let me just ask a little clarifying one. Can these nurses be fired if they fail to do this monitoring? These nurses are not specifically, as I understand, for failure to do this monitoring. But the nurses certainly could be fired and subject to adverse personnel action for failing to perform the required duties of their job. Outside their work hours. They actually cannot. A nurse can be fired for failing to perform at a satisfactory standard. But the statutes actually prohibit nurses from being disciplined for refusing to work outside their work hours. They may not be subject to discipline for failing to work outside their work hours. So it's the same thing. The nurse says, I was unable to finish all of my view alerts during the work hours. And the boss says, well, you were obligated to do this. I couldn't get the job done, so you're fired. The failure to have concluded your work view alerts on time is going to get you fired, right? No, Your Honor. The failure to conclude your view alerts is not going to get you fired. If the view alerts are certainly pressing matter, there is an approval procedure in place where they may go back. They may go after the fact or seek approval. And they have done that in their case in several instances. They have gone and advanced their supervisor. What's going to happen to the nurse who has worked eight hours a day and punched the clock? I got my eight hours in. And they go home and they get a view alert. And the view alert says this view alert must be answered before the beginning of work tomorrow morning. That is not actually, that's not an accurate situation. What do you mean it's not accurate? The allegation and the complaint is that view alerts can come at any time, at any place, with any time function on them, when to do them. But they are not immediate for that nurse at home. Because what view alerts are, it comes from a misunderstanding and a mischaracterization of view alerts, with all due respect, Your Honor. What view alerts are is But that misunderstanding I've got is because you didn't make it clear in your brief what they were. Right? So why doesn't a view alert include something that the nurse receives after she's gone home after eight hours of work? Nurses are shift workers. These view alerts are electronic pop-up notifications that go to an entire team that's caring for one patient. There's 24 hours continuity of care. So just because, presumably, I as a nurse have gone home, there is another nurse on staff caring for that patient at that same time who is receiving that urgent view alert. Why do they even have the computer then? Why do they get the view alerts when they're off duty? They get view alerts just like we would get, those of us who use Outlook email would get a pop-up or a task notification. But these computers are given to, first off, these computers and VPNs are not given to all nurses. Certain nurses are given them, and there are specific, in the VA handbook, off-site duties, which they are given for or given to these nurses to perform these off-site duties or the doctors to perform off-site duties. As well, they're given to nurses when they do obtain authorization for overtime work. They may use those laptops. So they're paid for the off-site duties, which they're directed to. Yes. Yes, Your Honor. They are paid for the off-site duties, and that's giving them the means, the laptops, the means to complete authorized off-site duties either during the day. And you're saying the norm is that the person, the nurse who receives the view alert, knows that that is not applicable to them because they're not on duty. Isn't that a factual question? No. Well, perhaps in certain contexts, Your Honor, but the view alerts, what they are, are these view alerts go out. These are electronic notifications to an entire panel. So what it is, is in many cases, it might be patient X has an allergy notification. Patient X needs allergy medicine. Well, that's going to go to the care. Let me ask you this, though. Supposing what you're saying isn't true. Supposing that, in fact, the nurses are told when this view alert pops up, whether you're on duty or not, you're obligated to deal with it. Would that change the government's position? If these supervisors with authority told these nurses that you are obligated to answer this view alert while you are off duty, that could, under certain circumstances, constitute an express directive to perform work outside of business hours. Doesn't the complaint encompass that very allegation? No, Your Honor, it does not. What it says is it encompasses the fact that these nurses are required to respond promptly to these view alerts. It does not actually direct them to perform work outside of business hours. Promptly could mean the next day. Promptly could mean at any point in time during their shift. Are you saying it directs them not to perform the work outside of regular hours? The complaint does not state that. Can I just turn it around a little bit? I mean, we can argue, we can talk about view alerts till the cows come home because nobody in the briefs really told us what they're all about. But it's alleged here, and the judge below has said that if inducement works as a theory, she's taking this case to trial. She said that. Okay, so let's go back and talk about the elephant in the room. So tell me what it is about Hanson that affects the interpretation under FIPA of the words officially ordered or approved. What Hanson did was Hanson undermined the rationale on which the Anderson case was based. Both Hanson and Richmond, Your Honor. In what respect? Hanson and Richmond, the decisions in Anderson holding that inducement, in this case, what you had was not a valid theory because you could not subject the federal treasury to payments that were not authorized by statute. Yes, Your Honor. Hanson, dealing with an unrelated statute, says you can't ignore the writing requirement. The writing requirement is a valid requirement. Hanson, yes, Your Honor. That's what Hanson said. Tell me, find some words in Hanson that have to do with the FEPA. None, right? No, Your Honor. And find words in Hanson that have to do with interpreting the statutory phrase officially ordered or approved. Answer, none. Hanson, Your Honor, though, what it does undermine the rationale of Anderson by finding that you cannot... I agree with you. It undermines the rationale of Anderson, which was we can go ahead and award back pay, or there's under the inducement theory, or there's a regulation that says it has to be in writing. We'll ignore the regulation. It's our position that Hanson... Let me say this to you so we can kind of get where we're going. Let's assume, for purposes of argument, that the court doesn't agree with your interpretation of Hanson. Let's assume that the court takes the position that Hanson only involves the writing requirement, and that the interpretation of Anderson, that FEPA magic words include inducement, okay? Then I'm asking you, why didn't Congress ratify that language when it enacted 7453? Congress did not... Congress did not ratify that language, Your Honor, because they are different statutes, and... Wait a second. I'm talking about Congress ratifying the language in FEPA as interpreted by Anderson. The doctrine of legislative ratification, I would think, says that Congress is aware of the way Anderson was interpreting and consistently interpreting the FEPA language. And so Congress, okay, when they enact a statute using the same language, the legislative ratification rule says we presume that Congress adopted the same interpretation. Well, as this court recognized in Doe, Your Honor, there had been significant precedent on both sides, and... That's a non-starter. The significant precedent on both sides was the cases before Anderson and after Anderson. Your Honor, they... So what argument do you have? What authority did the Doe panel have to upset the longstanding, congressionally ratified interpretation of the FEPA statute of the words officially ordered and approved? Officially... What power did the Doe panel have to do that? And... You know, you can't overrule a line of precedent except when you're in bank. Anderson didn't actually interpret officially ordered or approved. What Anderson did was said that you cannot... The inducement is sufficient to satisfy to... When they failed to give the writing, Your Honor, when they failed to satisfy... That can't be so. The theory that there has been... The statute, the FEPA statute was the same language in Anderson, the magic language as it is now. Officially ordered or approved. So under Anderson, how... Where was the official ordering or approval? It's right on the first page of Anderson. It says because it was induced. It was induced. Thereby interpreting the language to allow inducement to qualify as a official order or approval. In this case, Your Honor, it's the government's decision that the official... As this court recognized in Doe, official order approval does require some form of normality. And that is consistent with... I ask you, where do they get the authority to do that? You know, I just can't write an opinion in which I say I don't really care what previous precedent of my court says. I'll just write what I think it should say. In Title 38, Your Honor, Anderson was a... As in Doe were FEPA cases. In Title 38, Your Honor, this official order of approval does not include an inducement. It's... Well, you've told us that in your briefs that 7453 in Title 38 has to be interpreted the same way that we interpret the language in FEPA. Right? Yes, Your Honor, they are consistent. That's your bedrock principle. They are consistent. Right. And so all I'm saying to you is if you trace through the law up till the time that Doe was decided in this court, the law was that inducement satisfies a official order or approval. That's correct, right? And the Anderson line of cases, Your Honor, yes, did hold that inducement was sufficient... Under the interpretation of FEPA. ...was sufficient in those cases, Your Honor. I see... And so I'm just saying where... If you can show me the intervening Supreme Court authority that tells me that inducement is an incorrect interpretation of officially ordered or approved, then I'll rule in your favor. But you've got to show me that Supreme Court case. We rely on Hanson and Richmond, Your Honor. If you rely on Hanson, then your case is over, right? We respectfully disagree, Your Honor. Well, how can you? Because, Your Honor, Hanson undermined the rationale of Anderson. Hanson undermined Anderson. And in this case, the plain language as well as the other statutes and the precedent of this court, as well as the fact that it is consistent with the VA regulations, all require some form of formality and some form of express direction in order to satisfy the statutory requirements... It's not a VA regulation. It's a handbook, right? Yes, and those handbooks are equivalent to regulations. They're different between a handbook and a regulation for purposes of deference, right? So where in the handbook is there a requirement of express right or express direction? It's consistent with the policy of the VA in the handbook. The handbook... It's one thing, Counselor, to speak in generalities to the court. They're unhelpful. You should cite the language in the manual that supports the argument you're making. A70, Your Honor, in the handbook. The words. What are the words in the manual? Where is it in the record? The manual, Your Honor, it supports the requirement that overtime be authorized. There's no doubt that overtime has to be authorized, otherwise it couldn't be paid. Overtime must be demonstrated as wholly supported from the standpoint of emergency and or efficiency in carrying out... Where are you reading from? A70, Your Honor. A70. 5007 of the handbook, page A70, Your Honor. In the general section about the VA's policy on overtime... Yes. Several facets, several portions of that paragraph support the fact that overtime must be formally authorized, ordered, or approved. Formally? I apologize, Your Honor. Be careful with your words, Counselor. It must be expressly authorized or approved. Where does it say that? Several sentences of this general paragraph. Pick one and read it for me. Each responsible official shall adhere to a policy of authorizing only such overtime as can be readily demonstrated as wholly supported from a standpoint of emergency or efficiency in carrying out responsibilities with due regard to the cost and availability of funds. And that could well be the person who is inducing the nurse to do the work. It must be... I would assume that in the order of things, at this stage in the game, we're assuming that if a nurse is being required to perform this view alert outside of ordinary work, it's somebody who's telling them to do it. A policy of making them do it is legitimate, right? The VA policy is that overtime should only be used when absolutely necessary, and it's necessary to provide control and prevent the abuse of cost, Your Honor. And that's specifically the VA policy. Nobody on the other side of this case is arguing the contrary. They just want to be paid for the overtime that has been... We're running well past time. And before I let you sit down, I want to take you to paragraph 15 of the complaint, which defines view alerts and says view alerts may be sent from physicians, other providers, pharmacies, and so on. They may be sent at any time and at any hour of the day or night. View alerts are continuously sent to nurses to complete with no limit as to how many view alerts each nurse may receive or be asked to perform. Now, we're taking that complaint as true. And if we take it as true, doesn't that sort of take us back to where I asked? Doesn't that sort of shoot down your case? It does not, Your Honor, because nurses can be asked to perform view alerts at any time during their shift. View alerts can pop up at any time. But that's not what the complaint says. I know what you told me. That's why I went and dug up the complaint. The complaint is different than that. And look, I'm not saying you're wrong. I'm saying that we have to believe you're wrong. View alerts, as the complaint alleges, view alerts must be completed within two weeks. And they can come up at any time, and they have to be completed at any time. But the fact that they must be completed in two weeks is an excuse. Read the next sentence. Under their professional responsibilities as patient advocates, nurses have an obligation to complete all view alerts. Complete but not complete outside the course of their business hours or regular hours. Let them die. Pardon? Let the patient die. That's a different situation in this case, Your Honor, because view alerts, they're nurses or shift workers. They're just because this nurse outside of her business hours received a view alert. Nobody's saying they're shiftless. Pardon? No, I'm sorry. Go ahead. Just because this nurse does not mean that the nurse on call who's responsible for patient care received that exact same view alert. Likewise, these view alerts, for the most part, are not the form of emergency communication. It would be derelict on most people's part to communicate an emergency through an electronic pop-up. If there were an emergency that impacted patients' life or death, that's communicated via phone call, via on-site walk-ins. But the view alerts are not of that nature. Medication may be, though. Right, and that's why if it could be this patient has allergies, that's why it's sent to a team. The view alerts are sent to the entire team of nurses and doctors who are responsible for that care. And that person on call at that moment who sees if it were communicated that you had to deliver that medication, it goes to the nurses and the doctors and everybody that is on call for that specific patient to handle during their shift. I suspect that what the plaintiffs are in fact alleging in this paragraph is that it's just not within them because of their professional obligation to say, sorry, it's not my job. Sorry, it's not my – their job would be to perform their duty during the course of their workday. It might not be in their job to leave their view alert idle, but that is not akin to being required to complete them outside of the day and actually check off if they viewed this idle. You can wrap it up. I'll let you. With all due respect, Your Honor, the government would request that you express that this court affirm the decision of the trial court because it is properly held that the statutory language as well as this court's precedent and the VA regulations all require an express directive or some form of written direction to complete overtime outside basic work week. Thank you, Your Honor. Thank you. Well, Mr. – yeah, Mr. Cook, you have a minute. Now, we ran over another seven, and I'd give it to you, but I think you'd be a damn fool to ask for it. Your Honor, I will only take one minute, and I will make two points. First, at page 64 of the appendix, section E1, reporting test results. Results are communicated to patients no later than 14 calendar days from the date on which the results are available to the ordering practitioner. Significant abnormalities may require review and communication in shorter time frames, and 14 days represents the outer acceptable limit. For abnormalities that require immediate attention, the 14-day limit is irrelevant as the communication should occur in the time frame that minimizes the risk to the patient, which recognizes that the duty of the Title 38 nurses runs to the patient and not to the VA. Thank you, Your Honors. Okay. That concludes this portion.